UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
JAIR WILLIAMS,

                         Petitioner,

        -against-

WILLIAM A. LEE,

                    Respondent.
-----------------------------------------------------------------x

                **MEMORANDUM AND ORDER**

                13-CV-238 (SLT)

**TOWNES, United States District Judge:**

In October 2002, petitioner Jair Williams was convicted of murder in the second degree, attempted murder in the second degree, and criminal possession of a weapon in the second degree in connection with a shooting which took place in a Brooklyn night club in the early morning of January 2, 1996. Petitioner, who is currently incarcerated in a state correctional facility, now brings this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging that conviction. For the reasons set forth below, the habeas petition is denied.

### BACKGROUND

In the early morning of January 2, 1996, Frederico Jaen and his girlfriend, Beyra Henriquez, were shot while dancing at Club Michelle, a bar or lounge located at 2294 Bedford Avenue in Brooklyn. Henriquez died within hours but Jaen survived and, within a few days of the shooting, identified petitioner as the perpetrator. However, since petitioner fled to the Washington, D.C., area immediately after the incident and lived in Virginia under assumed names, the police were unable to locate him for several years. In 2001, petitioner was indicted on charges of murder, attempted murder, and related offenses. In late April 2002, petitioner went on trial in the Supreme Court of the State of New York, Kings County, before Justice Joel M. Goldberg and a jury.

Prior to the start of voir dire, the prosecutor made an application pursuant to *People v. Molineux*, 168 N.Y. 264, 61 N.E. 286 (N.Y.1901), seeking permission to introduce evidence that petitioner and Jaen had a fistfight a month or so prior to the shooting (V. 17-18).[1] Petitioner's counsel objected to the introduction of this evidence, arguing that "the prejudicial value would outweigh the probative value" (V. 20). Justice Goldberg rejected that argument, finding that evidence of the fistfight was important to prove motive and not unduly prejudicial (V. 20).

*The Trial*

Although a dozen witnesses testified at trial, only three were eyewitnesses to the shooting: Tachany Henriquez, Lillian Sheppard and Frederico Jaen. Henriquez testified that she; her sister, Beyra; and Jaen went to Club Michelle sometime after midnight in the early morning of January 2, 1996 (T. 39-40). At the time, Jaen, also known as "Kiko," was Beyra's boyfriend and Henriquez was "running for Panama Queen" (T. 38-40).

According to Henriquez, Club Michelle is a bar or lounge, about 25 to 30 feet long, frequented largely by Panamanians (T. 40-41, 51). Although Henriquez testified that the club was located "on Bedford and Snyder" in Brooklyn (T. 40), evidence provided by Detective Curtis Harris of the New York Police Department's Crime Scene Unit establishes that the club was actually located at 2294 Bedford Avenue, on the southwest corner of Bedford Avenue and Albemarle Road—the street one block south of Snyder Avenue (T. 296-97). Detective Harris described the establishment as "a bar, ... with a number of cocktail tables, chairs, a disk-jockey booth, rear kitchen, and stair leading to the basement area" (T. 291). The club has two doors: a front entrance located on the corner and a back door located on Albemarle Road (T. 60).

---

[1]Numbers in parentheses preceded by "V" denote pages in the transcript of the voir dire. Numbers in parentheses preceded by "T" and "S" denote pages in the trial transcript and the sentencing transcript, respectively.

By all accounts, the club was very crowded or "packed" that night (Henriquez: T. 41, 48; Sheppard: T. 107; Jaen: T. 203). At least some of the patrons were dancing in an open area at the rear of the bar (Henriquez: T. 41; Jaen: T. 203). Henriquez recalled that she and her sister stood near a bathroom at the back of the establishment, "just talking about the people" they saw (T. 41-42).

According to Henriquez, she saw at least four people she knew from the neighborhood: petitioner and three other men (T. 42-43). Henriquez, who had gone to school with petitioner, referred to him as "Jair" at trial but testified that he was also known by the name, "Reggie" (T. 43, 50-51). Henriquez claimed that she was "friendly" with all four men at the time, but she did not interact with any of them that night (T. 43).

Around 4:15 a.m., Henriquez, who had been dancing with Jaen, switched places with her sister (T. 44). As she stood by the bathroom door, about six feet from where Jaen and her sister were dancing, Henriquez heard four shots (T. 44-45). Henriquez did not see who fired the shots (T. 45). She immediately ran outside along with many of the club's other patrons (T. 46). She did not realize who had been shot until, unable to find her sister outside, she re-entered the club to find Jaen and her sister on the floor (T. 46).

Like Henriquez, Lillian Sheppard re-entered the club immediately after the shooting. Sheppard testified that she went to Club Michelle almost every weekend back in 1996 and knew almost everyone in the club on the night of the shooting (T. 98). That evening, she arrived at the club around 2:00 a.m. to find that Jaen and his girlfriend were already there (T. 105-06). She first saw petitioner in the club about an hour later (T. 105). Although Sheppard had seen petitioner in the street almost every day for a few years prior to January 2, 1996, she had only a

3

"hi-and-bye friendship" with him (T. 102). She knew petitioner as "Jair," but was aware that others called him "Reggie" (T. 101).

According to Sheppard, petitioner appeared "nervous" that night, as if "he was going to do something" (T. 103). She noticed the handle of a handgun in his waistband and saw him showing the weapon to other people (T. 103-04). She also observed him leaving and re-entering the club on a number of occasions (T. 104).

At around 4:00 a.m., Sheppard received a message that her boyfriend was outside and left the club via the rear entrance to speak with him (T. 107, 122). After a short conversation, Sheppard decided to go home with her boyfriend and attempted to re-enter the club to retrieve her coat (T. 109). As she attempted to navigate through a crowd blocking the rear entrance, Sheppard heard a shot emanating from inside (T. 110, 113). At the time, petitioner was "right there" at the rear entrance, close to the bathroom door, and only five or six feet away from where Jaen was still dancing with his girlfriend (T. 111-12).

Unable to enter through the rear door, Sheppard immediately ran to the front entrance (T. 113-14). Although she was able to re-enter the club, she was immediately thrown to the ground by a friend who was running outside (T. 114). From the ground, Sheppard heard a second gunshot (T. 115). She looked up to see petitioner with a gun in his hand running out the rear door (T. 115). Peering through a big window onto Albemarle Road, Sheppard saw petitioner hand the gun to a friend in a gold Nissan Legend, which then drove away (T. 116-17). Petitioner then jumped into a car behind the Legend and left the scene (T. 117). Sheppard did not see petitioner in the street anymore after that (T. 102).

The third eyewitness to the shooting was Jaen himself. He testified that he accompanied the Henriquez sisters to Club Michelle in the early morning of January 2, 1996, arriving sometime around 2:00 or 3:00 a.m. (T. 202). Although the club was "really crowded," Jaen knew most of the people who were there (T. 203-04). That included petitioner, who Jaen spotted in the club about 15 minutes after Jaen arrived (T. 205-06). Jaen knew petitioner from Panama, where Jaen had gone to school with petitioner's older brother, Ricky, in the mid-1980's (T. 205-06, 228). According to Jaen, petitioner has the "same face" as Ricky and looks a lot like him (T. 205).

Although Jaen claimed that he and petitioner were neither friends nor enemies (T. 206), he recalled fighting with petitioner in October 1995, less than three months earlier. Jaen testified that he had attended a Sweet 16 party for his ex-sister-in-law, Yamilka Davis, at which Herodes—a friend of petitioner's and someone with whom Jaen had a "hi-and-bye" relationship —"grabbed [Jaen's] chain" (T. 208-09). Jaen confronted Herodes and a fistfight ensued between Jaen and both Herodes and petitioner (T. 210). Even though Jaen was outnumbered, Jaen was winning the fight when other partygoers broke it up (T. 211). As Jaen was leaving the party, he saw petitioner and Herodes—who had left the party earlier—running towards him (T. 212). Jaen managed to hail a cab before the other men could renew the hostilities (T. 212). Thereafter, Jaen saw petitioner every week or two (T. 206), but petitioner only "screwed his face" rather than resume the fight (T. 212).

At around 4:00 a.m. on January 2, 1996, Jaen was dancing with Beyra close to the rear door of the club (T. 213). Jaen had his back to the door and to petitioner, who was at the end of the bar, close to the kitchen door (T. 213-15). Jaen heard two shots and was felled by the second

5

(T. 215). From the floor, he saw petitioner by the rear door with a handgun (T. 215-17). Petitioner looked at Jaen for a couple of seconds, then joined most of the other patrons in running outside (T. 216-17). Jaen never saw petitioner again (T. 227).

Although Jaen was not in pain at first, he could not move his legs and soon realized that he had been shot twice in the lower back (T. 218-20). One of the bullets had exited his midsection and struck Beyra (T. 221). She was lying on the floor about two feet away from Jaen (T. 218).

During direct examination, Jaen not only described the injuries he suffered on January 2, 1996, but displayed the wounds to the jury (T. 219-21). First, he displayed the entrance wounds on his lower back (T. 220), then displayed the exit wound on his front (T. 221). On cross-examination, Jaen testified that he had suffered gunshot wounds to his upper back in a separate shooting which occurred a year earlier (T. 246). However, defense counsel was not permitted to question Jaen further about the prior occasions on which he had been shot (T. 247-251). Indeed, the Court instructed the jury to ignore evidence of a shooting that occurred on any date other than January 2, 1996 (T. 252).

In addition to these three eyewitnesses, the prosecution introduced evidence that petitioner had confessed his involvement in the shooting to his uncle, Joseph Daniel Lashley. Lashley testified that just after New Year's in 1996, petitioner came to visit him in Washington, D.C., saying that he had a "problem" (T. 336-37). Petitioner stayed with Lashley for a "couple of weeks" before moving to a Maryland apartment owned by a friend of Lashley's (T. 337-38).

At some point, petitioner described his "problem" to Lashley, stating that he had a "beef" with an unnamed "guy" that began at a party (T. 339). Petitioner further stated that he

encountered the guy in a bathroom at Club Michelle shortly after New Year's in 1996 (T. 341). After the man exited the bathroom and resumed dancing, petitioner shot him in the back (T. 341-42). The woman with whom the man had been dancing was also hit by the gunfire (T. 342).

On direct examination, Lashley admitted that he was receiving a benefit for his testimony against petitioner. In 1999, Lashley had been sentenced to 324-months' imprisonment for a federal drug conviction (T. 335-36). In exchange for his testimony against petitioner, the Assistant District Attorney promised to send a letter to the judge, prosecutor, and defense counsel in the federal case, detailing Lashley's assistance to the prosecution (T. 343). The ADA could not promise that the letter would have any effect on Lashley's federal sentence (T. 343), and Lashley testified on cross examination that he did not think his testimony would result in a sentence reduction (T. 349-50).

Aside from the three eyewitnesses and Lashley, the prosecution presented eight other witnesses. One was Yamilka Davis, whose Sweet 16 party had been the scene of the fight between Jaen and petitioner. Davis testified that a fight had broken out between Jaen, who was her sister's boyfriend, and another "guy" (T. 379-81). However, Davis had not seen the person who fought with Jaen at her party or at any point previously and did not know who he was (T. 381-82).

Another witness was Dr. Beverly Leffers, an employee of the Medical Examiner's Office who had witnessed, but not performed, the autopsy on Beyra Henriquez (T. 168-69). Dr. Leffers testified that a bullet had entered the victim's lower abdomen and severed her left ileum artery and vein before coming to rest on the inside surface of a pelvic bone (T. 169-70, 176). The doctor opined that the gunshot wound had caused her death (T. 176-77).

The remaining six witnesses were all police officers or detectives who were involved in the investigation. The first officer on the scene was John Nixon, who had been a uniformed patrolman at the time of the shooting. Alerted to the shooting by occupants of a car that pulled up alongside their cruiser, Nixon and his partner, David Reilly, arrived at the club shortly after the shooting to find patrons still streaming from both exits (T. 58-60, 82). The officers entered the club to find a man and a woman—later identified as Jaen and Beyra Henriquez—lying on the floor, bleeding (T. 61-62).

Nixon immediately radioed for an ambulance, which arrived about five minutes later (T. 63). He then spoke to people in the bar, attempting to detain as many as possible and succeeding in detaining some (T. 77-78, 82). At some point, an emergency medical technician who had been working on Jaen handed Nixon a bullet, saying that he said he had removed it from Jaen's leg (T. 64). Nixon vouchered the bullet, which was introduced as an exhibit at trial (T. 65-66).

On cross examination, defense counsel established that Nixon was no longer able to find the memo book which he was using on the night of the shooting (T. 76-77). Nixon described a memo book as a "log ... of the jobs that [he] answered," in which he recorded "important details of his ... day" (T. 76). He testified that he might possibly make notations in the memo book regarding the people he saw on the floor or the patrons he spoke with that morning, but could not recall if he had actually done so (T. 76-77).

Detective Curtis Harris of the Crime Scene Unit arrived at the club at around 6:20 a.m. (T. 290-91). By that time, both victims had been removed from the scene (T. 298). Harris found no ballistics damage or evidence (T. 293). Although he dusted for fingerprints, no identifiable prints were lifted (T. 295).

Detective Pedro Vergara testified that he was the detective in charge of the case (T. 303). Sometime on January 2, 1996, Vergara went to Kings County Hospital to attempt to speak with Jaen about the incident (T. 304). It proved impossible to have a productive interview at that time, however, because Jaen was in and out of consciousness (T. 304).

Vergara's partner, Robert Cortes, had more success the following day. Although Jaen was in pain (T. 374), he told Cortes that he heard three shots, not two, and felt pain immediately upon falling to the ground (T. 371). When he looked behind him, he saw a Panamanian man rushing towards the door (T. 371). Jaen described the man as 5' 6" tall, about 180 pounds, and about 18 years old, and said that if the man's name was not "Reggie," it was something like "Reggie" (T. 371-72). Jaen thought that this man, who was standing behind him and near the kitchen at the time of the shooting, was the perpetrator, but stated that he never saw him with any weapons (T. 371-72).

On January 5, 1996, Vergara returned to the hospital and showed Jaen several photographs (T. 310). According to Vergara, Jaen identified a photograph of petitioner's brother, Ricardo, but told the police, "That is Jair" (T. 311). Jaen also stated that while he was on the floor immediately after the shooting, "he saw the male he knows as Jair with whom he had a dispute in October, putting a gun in his waist and going out the door" (T. 318).

On May 7, 1996, Vergara interviewed Sheppard (T. 311-12). Sheppard told the detective that she had seen petitioner entering the club at around 3:30 a.m. with a gun in his waistband (T. 312-13). She further stated that at around 4:00 a.m., she was outside the club talking to her boyfriend when she observed petitioner exiting the club with a gun in his hand (T. 312).

At some juncture, someone in the Henriquez family gave Vergara raffle tickets bearing

9

the names of other men who were in the club that night, including Herodes and Reggie (T. 314-15). Vergara was able to track down and interview at least some of these men, including one Reggie Ruiz (T. 315). In addition, the detective was able to locate and interview petitioner's brother, Ricardo, albeit not until late June 1996 (T. 319-20).

Although Ricardo was the man depicted in the photograph Jaen had identified, the detective identified petitioner as a suspect shortly after the shooting (T. 368). Detective Cortes, who was assisting Vergara in the investigation, then attempted to locate petitioner, but was unable to find him in Brooklyn (T. 368-69). Cortes did not locate petitioner until sometime in 1998, when he found him living in the vicinity of Washington, D.C. (T. 369).

On September 4, 1998, Vergara traveled to Virginia where he interviewed petitioner, who was then using the names Damian Pacheco or Damian Balesia (T. 305-06). After reading petitioner his *Miranda* rights, Vergara asked petitioner about January 2, 1996 (T. 307-08). Petitioner admitted that he had been "at Michelle's," but stated: "Nothing happened. I shook the guy's hand" (T. 309).

After Vergara retired, the case was reassigned to Detective Charles Platt (T. 188). Platt testified that he visited Kings County Hospital in April 2002 to collect the bullet which was removed from Beyra Henriquez's body (T. 189-91). Platt also testified that he had visited Jaen in the hospital on April 18, 2001 (T. 188-89). Although defense counsel sought to establish that Jaen was in the hospital recovering from another shooting, the Court refused to allow defense counsel to pursue this line of questioning (T. 181-83). The trial judge rejected as speculative the defense argument that evidence of the subsequent shooting was relevant to show that petitioner was not the only person with a motive to shoot Jaen (T. 182). In addition, the trial court rejected

the argument that the subsequent shooting would establish that Jaen was a violent person and provide an innocent explanation for petitioner's decision to move to Washington immediately after the shooting (T. 185-86). The court noted that petitioner could not have known of the subsequent shooting at the time he decided to flee Brooklyn (T. 186),

At some point after Detective Platt recovered the bullet from Kings County Hospital, Detective Mark Basoa of the New York Police Department's Firearms Analysis Section examined the bullets recovered from the bodies of the two victims. He determined that both were fired from the same gun, which was either a .38 caliber or a 9 millimeter handgun (T. 281-85). However, since .38 caliber bullets and 9 millimeter bullets have almost the exact same diameter, it was impossible for Detective Basoa to determine the exact type of weapon involved (T. 282).

### The Charge and Deliberations

After the defense rested without introducing any evidence and after the prosecution and defense counsel made their summations, Justice Goldberg charged the jury. He instructed the jury on two counts of murder in the second degree—depraved indifference murder in violation of New York Penal Law § 125.25(2) and intentional homicide in violation of New York Penal Law § 125.25(1)—and on the lesser included offenses of manslaughter in the first degree and manslaughter in the second degree, advising the jury that the manslaughter counts were not to be considered unless the jury found petitioner not guilty of murder and the second-degree manslaughter count was not to be considered unless the jury found petitioner not guilty of the preceding three counts. The judge also charged the jury on the crimes of attempted murder in the second degree, assault in the first degree and criminal possession of a weapon in the second degree.

In addition, the judge gave an adverse inference charge relating to Detective Nixon's missing memo book. Justice Goldberg stated that Detective Nixon made entries in his memo book concerning this case and that the law required that those entries be made available to the defense, but that those entries were not turned over to the defense (T. 441). He then instructed the jury as follows:

> Generally, the law does not penalize unintentional loss or destruction of evidence. However, if you find from the evidence in this case that the memo book was deliberately destroyed or deliberately not found for the purpose of keeping the memo book from being used by the defense in this case, then the law permits you, the jury, to infer, if you believe it proper to do so, that if the memo book were produced and made available to the defense, that memo book would contain information helpful to the defense or information that would contradict the testimony of witnesses who testified for the prosecution.

> On the other hand, if you are satisfied that the memo book was not deliberately destroyed or deliberately not found in order to keep helpful information from the defense, then you may disregard the failure of the police to preserve and produce the memo book; and you should draw no inference unfavorable to the People from the failure to furnish the memo book to the defense (T. 441-42).

Defense counsel did not object to this charge.

The jury began deliberation at 1:20 on the afternoon of April 29, 2002 (T. 483). The following day, the jury reached a verdict, finding petitioner not guilty of both murder counts, guilty of manslaughter in the first degree and attempted murder in the second degree, and not guilty of the remaining counts. However, immediately after the verdict was announced by the foreperson and without any discussions with the lawyers, Justice Goldberg announced that he would not accept the verdict at that time (T. 514). The judge explained that the verdicts were inconsistent, saying, among other things:

> Under Count 2, Murder in the Second Degree it's with intent to cause his death he caused her death. You found him not guilty of that, which means either he didn't cause her death or he did not have an intent to cause his death. But under Count 3, you found him guilty of Manslaughter in the First Degree, which means you found he did cause her death. ... But then at the same time you found that the defendant did have an intent [to cause Jaen's death] because you found the defendant guilty of Attempted Murder. If he did not have the intent to cause the death of Mr. Jaen, then he has to be not guilty of Attempted Murder (T. 514-15).

The judge returned the jury to the jury room with a new verdict sheet, directions to "think about what you did," and the following admonition:

> His state of mind can't change as you are going down the counts. You have to decide what the prosecution has proven regarding his state of mind. You can't say he did not have an intent to cause death under Murder in the Second Degree and find him not guilty of Murder in the Second Degree, and then find he did have an intent to cause death and find him guilty of Attempted Murder. It's the same intent. So, I would like you to reconsider all of the charges, and when you unanimously agree on a verdict, let us know. ... At this time I am not sure that you yourself are clear on what you actually meant to do. ... So, I will not accept your verdict that this time. Go back and resume your deliberation (T. 517)

Defense counsel did not object to the judge's actions. However, immediately after the jury left the courtroom, Justice Goldberg stated, "I realize you didn't have a chance to be heard. Would you like to be heard at this time?" (T. 517). Defense counsel then argued that the judge had violated his client's right to a fair trial and should have simply accepted the verdict (T. 517-18). In response, the Court noted that New York Criminal Procedure Law ("CPL") 310.50(2) required him to direct a jury to reconsider its verdict if that verdict was "not in accordance with the court's instructions" or "otherwise legally defective" (T. 528). He stated:

> It could be argued that the verdict is not defective in form and is, in fact, in accordance with my instructions. However, I believe that

based on the apparent inconsistencies that it was not in accordance with my instructions because the jury did not understand the definitions of the counts that they were deliberating on ..." (T. 528).

Defense counsel argued the first verdict rendered by the jury did not "fall within" CPL 310.50(2)" (T. 528-29).

At around 4:30 p.m. on April 30, 2002, the jury sent the court a note, stating: "We cannot come to a unanimous verdict" (T. 536). Justice Goldberg announced that he intended to tell the jury to continue to deliberate, but added:

> Apparently, at one time they had an agreement on certain things, and I believe that if they put aside any emotions that they may be feeling about the case, or any feelings of sympathy, either for the defendant or the deceased or for anyone else, they should be able to reach a verdict (T. 536-37).

Although defense counsel objected, requesting that the court merely direct the jury to continue to deliberate, Justice Goldberg proceeded to give a supplemental charge which petitioner's appellate counsel would later characterize as an *Allen* charge.[2] The judge stated:

> I know you have been on sort of an emotional roller coaster. You thought you had a verdict and then I said some things to you, and you went back, and I asked you to continue to deliberate. I have your note now that says that you can't come to a unanimous verdict.
>
> I am going to ask you to continue to deliberate because at one point you had a verdict and you did reach an agreement. I explained some things to you that I felt that you might have misunderstood, but I didn't say I wasn't going to accept the other verdict either; I just wanted to make sure that you all understood what each of those charges meant.
>
> So I am going to ask you to continue to deliberate. I will ask you to put any feelings of emotion aside. That is where you have to be a judge. You took an oath to decide the case on the law and the

---

[2]For reasons discussed on page 32, *post*, this supplemental charge was not actually an *Allen* charge. Nonetheless, the Court will refer to this supplemental charge as the *Allen* charge.

facts of the case, and remember all of the promises made at the beginning that whichever way the verdict comes out, it might not be making you happy but you promised me regardless of that, you would bring in a verdict based on the law and the evidence in the case.

So, if the emotions are becoming a little bit heavy at this point, I can understand that, but try to take a deep breath and try to step back and take the roll [*sic*] of a judge, which is what you have to do.

If you have any feelings of sympathy, as we said, either for the deceased or for Kiko or the defendant, you have to put that aside also. You can't base your verdict on any feelings of sympathy either.

As I have said, you have taken an oath to return a verdict on the law and the evidence in the case. You have analyzed the evidence. I believe that you have all paid careful attention to the facts of the case. I have done my best to give you legal instructions. If you have any questions about the legal instructions or anything that I have said, let me know, but at this time I am going to ask you to continue to deliberate on the case (T. 537-39).

Defense counsel did not object to the substance of this charge.

Sometime the next morning, the jury announced that it had reached a verdict (T. 543). Instead of having the foreperson read the verdict, the judge asked to see the verdict sheet. That document revealed that the jury found petitioner guilty of intentional homicide, attempted murder in the second degree and criminal possession of a weapon in the second degree, but not guilty of the remaining counts, including the two manslaughter counts. The judge chided the jury for ignoring "the small print on the verdict sheet," which instructed them not to return a verdict on the manslaughter counts if it convicted petitioner of either of the murder counts (T. 544). Noting that a defendant could not "be guilty of murder and not guilty of manslaughter" (T. 544), the judge directed the jury to resume deliberations (T. 545). He promised to "send in another verdict sheet," and exhorted the jury to "read it, please" (T. 545-46).

Later that morning, the jury sent the court another note stating that it had reached a verdict. Justice Goldberg examined the verdict sheet and, once again, found it lacking. After consulting with counsel, the judge addressed the jury:

> I have looked at the verdict sheet at this time and have shown it to the attorneys. You indicated the counts you found the defendant guilty on, but you have to indicate the counts the defendant is not guilty on. If you find the defendant guilty of Count 1 or 2, just leave Count 3 and 4 blank. You still have to return a verdict of guilty or not guilty on Count 1, which you did not; you did not find him not guilty or guilty on Count 6. If you reached that verdict, your foreperson can announce it, but I would like you to fill in the verdict sheet at this time. Just fill in the verdict sheet if you are prepared to announce the verdict, but I would like the verdict sheet to agree with what you announce (T. 547-48).

After an off-the-record sidebar discussion, Justice Goldberg announced, "I will take the verdict from the foreperson at this time," and asked the foreperson to rise (T. 548). Defense counsel objected to taking the verdict before the verdict sheet was completed (T. 548). The judge then asked if the foreperson had completed the verdict sheet and, upon learning that he had not, stated:

> Would you complete the verdict sheet at this time, indicating what counts the defendant has been found guilty and what counts the defendant is not guilty of so we will agree with what you are prepared to do (T. 548).

The foreperson then announced the verdict: not guilty of deliberate indifference murder and assault in the first degree, but guilty of intentional homicide, attempted murder in the second degree and criminal possession of a weapon in the second degree (T. 549-550). After the jury was polled and excused, defense counsel made a record of the fact that the jurors had engaged in some discussion in the jury box while the foreperson was completing the verdict sheet (T. 556). He argued that the jurors had engaged in "deliberations in open court," that this deprived

petitioner of a fair trial, and that the verdict should be set aside (T. 556). The judge denied the motion, stating that he did not "perceive" any deliberating but only "expressions of discomfort with maybe the other person's interpretations on how he was supposed to fill out the verdict sheet" (T. 557). When asked for his thoughts, the prosecutor opined that the jurors were not "talking about or deliberating on the facts," but addressing "confusion just about what to fill out on the verdict sheet" (T. 559). The prosecutor estimated that the conversation between the jurors lasted only "about five or ten seconds" (T. 559).

### The Post-Verdict Motion

On October 5, 2002, defense counsel filed a motion to set aside the verdict pursuant to CPL 330.30. That motion, which is attached as Exhibit B to the Affidavit of Allison Ageyeva in Opposition to Defendant's Petition for a Writ of Habeas Corpus (the "Ageyeva Affidavit"), contained two arguments. First, defense counsel argued that it was improper for the judge to resubmit the case to the jury after the reading of the initial verdict. Although the defense relied primarily on state cases interpreting CPL 310.50, the memorandum of law in support of the motion cited *United States v. Powell*, 469 U.S. 57 (1984), for the proposition that inconsistent verdicts should be left undisturbed because they could have been arrived at through compromise, lenity or mistake (Defendant's Memorandum of Law in support of the § 330.30 motion ("Defendant's Memo") at 7).

The second argument asserted that the defense should have been afforded an opportunity to be heard before the judge resubmitted the case to the jury after receiving the initial verdict. Defense counsel conceded that there was no authority requiring the judge to permit counsel "to participate in the framing of the comments made to a jury when a case is submitted for their reconsideration pursuant to CPL 310.50," but asserted that CPL 310.30 was an "analogous

17

statute" which provided "guidance" (Defendant's Memo, pp. 8-9). Defense counsel argued that CPL 310.30 ensured that counsel had an opportunity to be heard before a trial judge responded to a jury's question during deliberations because "counsel's input at this stage of the proceeding could well have a meaningful impact on the remainder of the deliberative process" (Defendant's Memo, p. 9 (quoting *People v. Lykes*, 81 N.Y.2d 767, 771 (N.Y. 1993)). Asserting that "[i]t is hard to imagine a circumstance that is more determinative of the outcome of the case than resubmission of the case to [the] jury after they have already announced a verdict," defense counsel argued that he should have been afforded the opportunity to be heard even if CPL 310.30 was not controlling (Defendant's Memo, pp. 9-10).

At sentencing on October 10, 2002, Justice Goldberg rejected both of these arguments. The judge opined that the initial verdict evinced jury confusion and cited to three state-court cases which upheld resubmission under similar circumstances (S. 5-9). With respect to notice, Justice Goldberg noted that § 310.50(2) did not require notice and that the defendant was not prejudiced because defense counsel had an opportunity to be heard after the judge made his comments to the jury (S. 10-13). Justice Goldberg then imposed concurrent terms of 25 years to life imprisonment for the murder, 12½ to 25 years for the attempted murder, and 7½ to 15 years for the weapon offense (S. 21).

### The Direct Appeal

Petitioner appealed his judgment of conviction to the Appellate Division of the Supreme Court of the State of New York. His Appellate Division brief contained three points. In the first, petitioner argued that the trial court denied him his due process right to a fair trial when it granted the *Molineux* application, but barred petitioner from adducing evidence of previous attacks on Jaen. Petitioner argued that because these "unbalanced rulings" prevented him from

arguing in summation that "others were violently motivated to harm Jaen" (Appellate Division Brief (attached to Ageyeva Affidavit as Exhibit C), p. 31), the trial court interfered with his right to present a defense and to have counsel give an effective summation and thereby violated his right to due process and the effective assistance of counsel.

In the second point, petitioner argued that the trial court denied his due process right to a fair trial by giving an incorrect adverse inference charge relating to Nixon's loss of his memo book. Relying on state law, petitioner argued that a trial court was required to impose "a remedial sanction" for even the inadvertent loss of *Rosario* material (*Id.*, p. 42). Petitioner argued that an appropriate sanction in this case would have been an instruction permitting the jury to draw "an adverse inference against the People for their failure to produce the prior written statement" (*id.*, p. 43), and that the judge's instruction directing the jury to draw an adverse inference only if there was evidence that Nixon lost or destroyed the memo book deliberately "was actually worse than no instruction at all" (*Id.*, p. 44). Petitioner acknowledged that his trial counsel had not objected to the adverse inference charge, and asserted that the failure to object constituted ineffective assistance of counsel (*Id.*, p. 46).

The third point of petitioner's Appellate Division Brief asserted that Justice Goldberg had committed three errors during jury deliberations which, cumulatively, violated petitioner's due process right to a fair trial. First, relying primarily on CPL 310.30, petitioner argued that he was entitled to notice and an opportunity to be heard before the court refused to accept the initial verdict and issued supplemental jury instructions. Petitioner faulted the trial court both for "lauch[ing] into its rejection of the verdict and lengthy explanation [of the defects in the verdict] without any prefatory comments whatsoever" (*id.*, p. 49), and for defining the elements of the offenses after assuring defense counsel that it would not do so. Unlike the CPL 330 motion, the

Appellate Division Brief did not cite to or rely on *Powell*, although it did cite to other Supreme Court cases for general propositions of law.

Second, petitioner argued that Justice Goldberg had given a coercive and unbalanced *Allen* charge. Petitioner argued that the *Allen* charge did not advise jurors not to abandon their convictions simply to reach a verdict (*Id.*, p. 54). He further asserted that the charge shamed the jury by stating that they were being emotional and implicitly pressured the jurors by implying that because the jurors had reached a verdict once, they should be able to do so again (*Id.*, p. 55). In addition, petitioner argued that trial counsel failed to provide effective assistance of counsel because he failed to object to the *Allen* charge (*Id.*, p. 56).

Third, petitioner argued that the trial court directed the jury to finish their deliberation in open court by telling the foreperson to complete the verdict sheet before announcing the verdict. Petitioner argued that the court's action "violated the rule that deliberations are to be privately conducted" (*Id.*, p. 57).

In a published opinion dated July 21, 2009—*People v. Williams*, 64 A.D.3d 734, 883 N.Y.S.2d 566 (N.Y. App. Div. 2009)—the Appellate Division rejected all of these arguments and unanimously affirmed petitioner's conviction. With respect to the first point, the Appellate Division held that Justice Goldberg's evidentiary rulings were correct. First, it upheld the *Molineux* ruling, finding that evidence of the prior fistfight was relevant to motive and intent and that its probative value outweighed any potential prejudice (*Id.*, 64 A.D.3d at 734, 883 N.Y.S.2d at 567). Second, it held that "evidence or argument that an unidentified third party may have committed the shooting was purely speculative and would have caused undue delay, prejudice, and juror confusion" (*Id.*, 64 A.D.3d at 735, 883 N.Y.S.2d at 568). In addition, the Appellate Division noted that the constitutional argument with respect to the trial court's exclusion of this

evidence was unpreserved for appellate review, and declined to review the argument in the interest of justice (*Id.*).

The Appellate Division also declined to reach the merits of petitioner's second point. The appellate court held that the "contention that the trial court's adverse inference charge ... was inadequate also is unpreserved for appellate review" (*Id.*). The Court declined to exercise its interest of justice jurisdiction to review that issue (*Id.*).

With respect to the third point, the Appellate Division rejected the view that CPL 310.30 required the trial court to provide defense counsel with notice and an opportunity to be heard before rejecting the initial verdict and resubmitting the case to the jury. While acknowledging that it might have been "better practice for the Supreme Court to have afforded counsel the opportunity to be heard," the Appellate Division noted that the trial judge was not responding to a "jury communication requesting information or instruction," which would have triggered the "meaningful notice" requirement of CPL 310.30 (*Id.*, 64 A.D.3d at 736, 883 N.Y.S.2d at 568-69). The appellate court noted that it was undisputed that the initial verdict was a "repugnant verdict," that CPL 310.50(2) required the court to "explain the defect to the jury and direct it to reconsider the verdict," and that § 310.50(2), unlike § 310.30, contained "no requirement that the trial court provide notice to the People and defense counsel" (*Id.*, 64 A.D.3d at 735-36, 883 N.Y.S.2d at 568-69).

The Appellate Division declined to rule on whether the *Allen* charge was unbalanced or coercive, finding this contention unpreserved for appellate review (*Id.*, 64 A.D.3d at 735, 883 N.Y.S.2d at 568). However, the court reached the merits of the question of whether the trial court's direction to complete the verdict sheet in open court was improper. Citing to *People v.*

*Boatwright*, 299 A.D.2d 603, 604, 748 N.Y.S.2d 541 (N.Y. App. Div. 2002), for the proposition

that "[a] verdict sheet is neither a verdict nor a substantive communication from the jury," the

Appellate Division found that the trial court's direction to the foreperson did not mandate

reversal of the conviction. (*Id.*, 64 A.D.3d at 736, 883 N.Y.S.2d at 569).

After receiving the Appellate Division's decision, petitioner sought, and was granted,

leave to appeal to the New York Court of Appeals (*People v. Williams*, 14 N.Y.3d 773, 925

N.E.2d 110 (N.Y. 2010)). However, the only arguments raised before the Court of Appeals were

those contained in the third point of the Appellate Division Brief. Specifically, petitioner argued

1) that the trial court gave extensive supplemental instructions in response to the first verdict

without giving defense counsel notice or an opportunity to be heard; 2) that the *Allen* charge was

unnecessary and coercive, and 3) that the direction to complete the verdict sheet in open court

was improper. In addition, petitioner argued that the trial court had improperly "signaled its

evident opinion that a murder conviction was warranted" and had "shepherded the panel, slowly

but surely, toward that verdict" (Court of Appeals Brief (attached to Ageyeva Affidavit as

Exhibit H), p. 28).

In a decision dated March 31, 2011, the Court of Appeals affirmed petitioner's

conviction, but addressed only the first and third of petitioner's four arguments. The Court

construed the first argument as contending "that the jury's reporting of a verdict inconsistent with

the trial court's instructions was the functional equivalent of a jury request for further instruction

or information, and that, consequently, defendant was entitled to notice and a chance to be heard

pursuant to CPL 310.30" (*People v. Williams*, 16 N.Y.3d 480, 485, 947 N.E.2d 130, 133 (N.Y.

2011)). The Court rejected this contention, holding that "CPL 310.30 applies to specific

'request[s]' by the jury 'for further instruction or information' by the court in response to a

problem or concern identified by the jury," and that the trial court's response was governed by CPL 310.50(2), which applies when a jury "renders a verdict which in form is not in accordance with the court's instructions or which is otherwise legally defective" (*Id.*, 16 N.Y.3d at 485-86, 947 N.E.2d at 133). The Court further held that, unlike CPL 310.30, section 310.50(2) does not impose upon the trial court a statutory duty to give the parties notice. The court reasoned that "[b]y not including (or incorporating) CPL 310.30's notice requirement within the text of CPL 310.50(2), the Legislature made a conscious choice that the notice requirement shall apply only to the court's response to a jury's request for further instruction or information, and not to the court's response to a jury's rendition of an inconsistent or defective verdict" (*Id.*, 16 N.Y.3d at 486, 947 N.E.2d at 134).

The Court of Appeals also rejected petitioner's third argument on the merits. The Court found "nothing in the record suggesting that the court's direction called for or encouraged deliberations among the jurors" or that "any public deliberations in fact occurred" (*Id.*, 16 N.Y.3d at 487, 947 N.E.2d at 134). In addition, the Court noted that since CPL 310.50(3) converts any incomplete counts into acquittals, the trial court had "asked that the foreperson perform what amounts to a ministerial (or clerical) act" (*Id.*) The Court held " that the performance of the instant ministerial act was not violative of the rule requiring jurors to deliberate in secret outside the courtroom" (*Id.*)

The Court of Appeals did not address the merits of petitioner's second argument, alleging that the *Allen* charge was unnecessary and coercive, or the fourth argument, which had been raised for the first time in the Court of Appeals. The Court held that these contentions were not preserved for appellate review (*Id.*)

***Petitioner's Pro Se Petition for a Writ of Error Coram Nobis***

In February 2012, petitioner, proceeding *pro se*, petitioned the Appellate Division for a writ of error coram nobis, asserting that the attorney who represented him on appeal before the Appellate Division and the Court of Appeals provided ineffective assistance of counsel. Petitioner faulted his appellate counsel for failing to raise two arguments: 1) that "the weight and sufficiency of the evidence ... were insufficient to sustain [his] conviction" and 2) that trial counsel was ineffective because he "failed to litigate a number of issues to include prosecutorial misconduct in his opening and summation" (Memorandum of Law in Support of Petition for Writ of Error Coram Nobis (attached to Ageyeva Affidavit as Exhibit K), p. 1). Petitioner's memorandum of law largely addressed the sufficiency issue, focusing primarily on Sheppard's testimony and dismissing the other eyewitnesses accounts as unreliable (*Id.*, pp. 4-5). Petitioner further argued that, even if the witnesses were credible and reliable, the evidence "only established that the Petitioner possessed what appeared to be a firearm," since none of the eyewitnesses saw petitioner fire a weapon (*Id.*, p. 5).

Petitioner's memorandum of law did not identify any instances in which trial counsel's performance was substandard. While petitioner asserted that the prosecution's opening statement "misinformed the jury as to the substance of the witnesses['] testimony" and that this prejudiced the defense (*id.*, p. 4), petitioner did not suggest that defense counsel, who had not yet heard the testimony, was aware of the misrepresentations. Petitioner also asserted that trial counsel would have committed "malfeasance" if he failed to preserve the legal sufficiency argument (*id.*, p. 6), but claimed that his attorney moved to dismiss the indictment at the close of the People's case on the ground that the People had not adduced sufficient proof of the charged crimes (*Id.*, p. 5).

In a decision and order dated July 18, 2012, the Appellate Division denied petitioner's application for a writ of error coram nobis, finding that he had failed to establish that he was denied the effective assistance of appellate counsel. Petitioner applied to the Appellate Division for permission to reargue the motion or for permission to appeal to the New York Court of Appeals, but both motion were denied in a decision and order dated October 23, 2012 (Ageyeva Affidavit, Ex. R).

***The Instant Petition***

On December 26, 2012, petitioner commenced this action by placing a *pro se* petition for a writ of habeas corpus into a prison mailbox. That petition raises five grounds for relief, the first three of which are identical to the grounds which petitioner raised upon his direct appeal to the Appellate Division. As a fourth ground, petitioner argued that his murder and attempted murder convictions were against the weight of the evidence. As a fifth ground, petitioner argued that he "was denied the effective assistance of counsel at trial and on direct appeal." However, petitioner did not identify specific instances in which his attorney's performance was substandard.

On June 18, 2014, the People responded to the petition by filing the Ageyeva Affidavit and a Memorandum of Law in Opposition to the Petition ("Respondent's Memo"). To the extent that they are relevant, the arguments raised in Respondent's Memo are addressed in the discussion below.

In September 2014, petitioner moved to stay this action in order to permit him to conduct discovery pursuant to Rule 6 of the Rules Governing Section 2254 Cases, to expand the record pursuant to Rule 7 of the Rules Governing Section 2254 Cases, and/or to hold an evidentiary

hearing pursuant to Rule 8 of the Rules Governing Section 2254 Cases. In a memorandum and order dated October 21, 2014, the Court denied these motions. After unsuccessfully seeking reconsideration (*see People v. Williams*, No 13-CV-238 (SLT), slip op. (E.D.N.Y. Nov. 20, 2014)), petitioner filed a notice of interlocutory appeal with the United States Court of Appeals. That appeal was dismissed effective January 8, 2015, for failure to pay the filing fee.

## DISCUSSION

### The Legal Standard Governing 28 U.S.C. § 2254 Petitions

"It is well established that a federal habeas court does not sit to correct a misapplication of state law, unless such misapplication violates the Constitution, laws, or treaties of the United States." *Ponnapula v. Spitzer*, 297 F.3d 172, 182 (2d Cir. 2002). Indeed, 28 U.S.C. § 2254(a) expressly provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." *See also Estelle v. McGuire*, 502 U.S. 62, 68 (1991). Moreover, following the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (quoting 28 U.S.C. § 2254(b)(1)). This "exhaustion doctrine seeks to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary." *Vasquez v. Hillery*, 474 U.S. 254, 257 (1986) (citing *Rose v. Lundy*, 455 U.S. 509, 515 (1982). "To provide the State with the necessary opportunity, the prisoner must fairly present his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim. *Baldwin*, 541 U.S. at 29 (internal quotations and citations omitted). "[O]rdinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Id.* at 32.

"[I]f a federal claim has not been presented to the highest state court or preserved in lower state courts under state law, it will be deemed exhausted if it is ... then procedurally barred under state law." *McKethan v. Mantello*, 292 F.3d 119, 122 (2d Cir. 2002) (citing *Ramirez v. Attorney Gen. of State of New York*, 280 F.3d 87, 94 (2d Cir. 2001)). If the claim is "deemed exhausted," however, it is also procedurally defaulted and "may be raised in habeas only if the defendant can first demonstrate either cause and actual prejudice, or that he is actually innocent." *Clark v. Perez*, 510 F.3d 382, 393 (2d Cir. 2008) (quoting *Bousley v. United States*, 523 U.S. 614, 622 (1998)). "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded ... efforts to comply with the State's procedural rule." *Id.* (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).

In addition, "federal courts may not review the judgment of a state court that 'rests on a state-law ground that is both "independent" of the merits of the federal claim and an "adequate" basis for the court's decision.'" *Jimenez v. Walker*, 458 F.3d 130, 136 (2d Cir. 2006) (quoting *Harris v. Reed*, 489 U.S. 255, 260 (1989)). Although the adequate-and-independent-state-ground doctrine originated in cases involving direct review "of state court judgments for which the alternative state and federal grounds were both 'substantive' in nature," the doctrine has been extended to federal habeas corpus proceedings and "has been applied routinely to state decisions forfeiting federal claims for violation of state procedural rules." *Harris*, 489 U.S. at 260-61 (quoting Daniel J. Meltzer, *State Court Forfeitures of Federal Rights*, 99 Harv. L. Rev. 1128, 1134 (1986)). Accordingly, "an adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." *Id.* at 262 (internal quotations and citations omitted).

A "state law ground is only adequate to support the judgment and foreclose review of a federal claim if it is 'firmly established and regularly followed' in the state." *Garvey v. Duncan*, 485 F.3d 709, 713 (2d Cir. 2007) (quoting *Lee v. Kemna*, 534 U.S. 362, 376 (2002). "Further, in certain limited circumstances, even firmly established and regularly followed state rules will not foreclose review of a federal claim if the application of the rule in a particular case is 'exorbitant.'" *Id.* at 713-14. In *Lee*, the Supreme Court "factored in three considerations to determine that application of the firmly established and regularly followed state procedural rule would be exorbitant[:] ...(1) whether the alleged procedural violation was actually relied on in the

28

trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had 'substantially complied' with the rule given 'the realities of trial,' and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest." *Id.* at 714 (quoting *Cotto v. Herbert*, 331 F3d. 217, 240 (2d Cir. 2003)).

***Petitioner's First Two Grounds***

Petitioner's first two grounds for relief in this case were raised before the Appellate Division but were not raised on appeal to the New York Court of Appeals. Petitioner is now procedurally barred from exhausting those issues. Petitioner cannot again apply for leave to appeal these claims in the Court of Appeals because he has already made the one application for leave to appeal to which he is entitled. *See* N.Y. Court Rules § 500.20(a). He also cannot seek collateral review of these claims because the issues were previously determined on the merits on direct appeal. *See* CPL 440.10(2)(a).

Although these two grounds are deemed exhausted, they cannot be reviewed by this Court because petitioner has not even alleged, much less established, cause and prejudice. To be sure, petitioner brought a petition for a writ of error coram nobis, accusing his appellate attorney of ineffective assistance of counsel. However, that petition did not fault the attorney for failing to raise the first two grounds before the New York Court of Appeals. Rather, petitioner faulted his appellate counsel only for failing to argue 1) that "the weight and sufficiency of the evidence ... were insufficient to sustain appellant's conviction" and 2) that trial counsel was ineffective because he "failed to litigate a number of issues to include prosecutorial misconduct in his

opening and summation." Memorandum of Law in Support of Petition for Writ of Error Coram Nobis, p. 1.

In addition, petitioner has made no attempt to argue that he is actually innocent of the crimes of which he was convicted. "In order to demonstrate actual innocence in a ... collateral proceeding, a petitioner must present 'new reliable evidence that was not presented at trial' and 'show that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt.'" *Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 114 (2d Cir. 2000)(quoting *Schlup v. Delo*, 513 U.S. 298, 299 (1995)). In this case, petitioner has adduced no new evidence but argues only that his conviction is against the weight of the evidence. "A showing of actual innocence requires more than merely arguing that the jury's finding of guilt is against the weight of the evidence." *Duell v. Conway*, No. 9:07-CV-1321, 2010 WL 2695641, at *6 (N.D.N.Y. May 6, 2010), *report and recommendation adopted*, No. 9:07-CV-1321, 2010 WL 2680208 (N.D.N.Y. July 1, 2010).

### *The Third Ground for Habeas Corpus Relief*

#### *A. The Allen Charge Issue*

The state courts expressly denied petitioner's *Allen* charge argument—one of the three arguments encompassed by petitioner's third ground for habeas corpus relief—on the basis of New York's contemporaneous objection rule, which is codified in CPL 470.05(2). The Appellate Division declined to review the issue of whether the *Allen* charge was unbalanced or coercive, finding this contention unpreserved for appellate review. *Williams*, 64 A.D.3d at 735, 883 N.Y.S.2d at 568. The Court of Appeals also did not address the merits of petitioner's claim that the *Allen* charge was coercive, holding that this contention was "not preserved for appellate review." *Williams*, 16 N.Y.3d at 487, 947 N.E.2d at 134.

The Second Circuit has held that the contemporaneous objection rule set forth in CPL 470.05(2) is a firmly established and regularly followed New York procedural rule. *Garvey*, 485 F.3d at 718. Moreover, application of the rule in this case was not exorbitant. There was nothing to prevent trial counsel from objecting to the *Allen* charge, yet trial counsel did not notify the trial court of the perceived defects in the charge. If petitioner had complied with the rule, the trial court would have had the opportunity to consider whether the *Allen* charge was coercive or unbalanced, and to provide supplemental or curative instructions.

Although petitioner does not expressly argue cause and prejudice, Petitioner's Reply contends that trial counsel' s failure to object to the *Allen* charge constituted ineffective assistance of counsel. *See* Petitioner's Reply, Point III. While an ineffective-assistance-of-counsel claim can serve as cause to excuse the procedural default of another habeas claim, *see Edwards v. Carpenter*, 529 U.S. 446, 450-51 (2000), petitioner's ineffective assistance claim has no merit.

*Strickland v. Washington*, 466 U.S. 668 (1984), established a two-pronged test for deciding ineffective assistance claims. To satisfy the first prong, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. Specifically, "[a] convicted defendant ... must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id*. at 690. To satisfy the second prong, a defendant must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. The Supreme Court defines "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id*. Further, "[t]he level of prejudice the defendant need demonstrate lies between prejudice that 'had some conceivable effect' and prejudice that 'more

likely than not altered the outcome in the case.'" *Linstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 693).

In this case, petitioner's counsel's performance did not fall below an objective standard of reasonableness. Petitioner's arguments are premised on the supposition that Justice Goldberg's Supplemental Charge was an *Allen* charge. Petitioner's Reply cites to *United States v. Haynes*, 729 F.3d 178 (2d Cir. 2013), for the proposition that "when an *Allen* charge directs jurors to consider the views of other jurors, specific cautionary language reminding jurors not to abandon their own conscientious beliefs is generally required." *Id.* at 193 (quoting *Spears v. Greiner*, 459 F.3d 200, 205 (2d Cir. 2006)). However, Justice Goldberg's supplemental charge was not technically an *Allen* charge. "[A] key aspect of an *Allen* charge is that it asks jurors to reexamine their own views and the views of others, which introduces the danger that jurors will abandon their conscientiously held beliefs, and thus warrants additional cautionary language." *Spears*, 459 F.3d at 204, n. 3 (citing *United States v. LaVallee*, 439 F.3d 670, 689 (10th Cir. 2006)). In contrast, "a 'judge's simple request that the jury continue deliberating, especially when unaware of the composition of the jury's nascent verdict' can not be 'properly considered an *Allen* charge.'" *Id.* at 204 (quoting *United States v. Prosperi*, 201 F.3d 1335, 1341 (11th Cir. 2000)).

In this case, Justice Goldberg's supplemental charge was largely an exhortation to resume dispassionate deliberations. He instructed the jurors to put emotions and sympathy aside and to decide the case based solely on the law and the evidence presented. The judge never directed the jurors to reexamine their own views and the views of their fellow jurors. Accordingly, there was no need to balance the charge with language cautioning jurors not to abandon their own conscientious beliefs, and defense counsel had no basis for objecting to the charge.

Petitioner's Appellate Division Brief also argued that the *Allen* charge shamed the jury into reaching a verdict and that defense counsel could have objected on this basis. However, nothing Justice Goldberg said could be reasonably construed as shaming the jury or pressuring them into reaching a verdict. Rather, noting that they had already reached a verdict once, the judge expressed confidence that they could do so again if they put emotion and sympathy aside and focused exclusively on their role as judges of the facts.

### B. The Notice Issue

In the second of the three arguments encompassed by petitioner's third ground for habeas corpus relief, which asserts that Justice Goldberg failed to give defense counsel notice or an opportunity to be heard before rejecting the initial verdict in this case, petitioner largely relies on CPL 310.30 and New York State case law. CPL 310.30 dictates the procedure to be followed when a deliberating jury requests "further instruction or information with respect to the law, with respect to the content or substance of any trial evidence, or with respect to any other matter pertinent to the jury's consideration of the case." That section specifically provides that "the court must direct that the jury be returned to the courtroom and, after notice to both the people and counsel for the defendant, and in the presence of the defendant, must give such requested information or instruction as the court deems proper." Before the Appellate Division and the New York Court of Appeals, petitioner argued that Justice Goldberg violated this statute by failing to give notice to defense counsel before rejecting the initial verdict. The state courts rejected this argument, holding that CPL 310.30 and state-law cases interpreting that section were inapplicable because Justice Goldberg was not responding to a jury request for further instructions or information.

Petitioner does not provide any authority to suggest that the state courts misapplied state law or that the misapplication violated federal law. To be sure, petitioner's state court briefs cited to some United States Supreme Court cases. *See* Appellate Division Brief, pp. 48-49; Court of Appeal Brief, pp. 28-29. However, those Supreme Court cases either were cited for general propositions, *see, e.g., N. Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S.601 (1975), and *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) (civil cases cited for the proposition that due process requires notice at a meaningful time and an opportunity to be heard in advance of official action that may significantly affect liberty interests), or related to jury communications requesting further instructions, *see, e.g., Rogers v. United States*, 422 U.S. 35, 39 (1975), and *Shields v. United States*, 273 U.S. 583 (1975). None of those cases suggest that the state courts' "adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States ...." *See* 28 U.S.C. § 2254(d).

### C. The Jury Deliberations Issue

In the third of the three arguments encompassed by petitioner's third ground for habeas corpus relief, petitioner contends that Justice Goldberg violated his due process right to a fair trial by "directing the jury to finish deliberations in open court by completing an incomplete verdict sheet." Petition, p. 11(A). "[C]ourts and commentators alike recognize that the secrecy of deliberations is essential to the proper functioning of juries." *United States v. Thomas*, 116 F.3d 606, 618 (2d Cir. 1997). While disclosure of the substance of jury deliberations may undermine public confidence in the jury system and pose a threat to adjudicatory finality, "the danger that such disclosure presents to the operation of the deliberative process itself" is

34

"[e]specially troublesome." *Id.* As Justice Cardozo noted: "Freedom of debate might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world." *Clark v. United States*, 289 U.S. 1, 13 (1933).

In making this argument, petitioner has principally relied on state cases in arguing that "[t]he presence of others with the jury during deliberations is cause for reversal." Appellate Division Brief, p. 56 (citing cases); Court of Appeals Brief, pp. 43-44 (citing cases). The briefs do not cite to any United States Supreme Court cases holding that a trial judge violates a defendant's rights under the United States Constitution by asking a jury foreperson to complete a verdict sheet in open court.

While a judicial direction to deliberate in open court may violate a defendant's due process rights, Justice Goldberg made no such direction and there is no evidence that jury deliberations occurred in open court. The record reflects that the jury sent the trial court a note indicating that it had reached a verdict, then entered the courtroom with a verdict sheet which did not reflect a verdict on Counts 1 or 6. Having received another defective verdict sheet earlier that morning which reflected verdicts on both those counts, Justice Goldberg had every reason to suspect that the omissions reflected a clerical problem, not a failure to reach verdicts on those counts. Accordingly, the judge instructed:

> *If* you reached that verdict, your foreperson can announce it, but I would like you to fill in the verdict sheet at this time. Just fill in the verdict sheet *if you are prepared to announce the verdict*, but I would like the verdict sheet to agree with what you announce (T. 547-48) (emphasis added).

No one told the court that the jury had not reached a verdict on all counts or was not prepared to announce its verdict. However, when Justice Goldberg again prepared to take the

verdict, defense counsel protested that the verdict sheet was still not complete. Upon verifying this fact, the judge directed the foreperson "complete the verdict sheet ... indicating what counts the defendant has been found guilty and what counts the defendant is not guilty of so we will agree with what you are prepared to do" (T. 548).

By all accounts, there was some conversation among the jurors following this direction from the court. Although that conversation was not transcribed, Justice Goldberg subsequently stated that he did not "perceive" any deliberating, only "expressions of discomfort with maybe the other person's interpretations on how he was supposed to fill out the verdict sheet" (T. 557). The prosecutor stated that the jurors were not "talking about or deliberating on the facts," but addressing "confusion just about what to fill out on the verdict sheet," and estimated that the conversation between the jurors lasted only "about five or ten seconds" (T. 559). Although defense counsel characterized the conversation as "deliberations," he did not take issue with the court's or prosecution's observations.

The New York Court of Appeals essentially discounted defense counsel's conclusory account of the jurors' conversation, finding "nothing in the record suggesting that the court's direction called for or encouraged deliberations among the jurors" or that "any public deliberations in fact occurred." *Id.*, 16 N.Y.3d at 487, 947 N.E.2d at 134. "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). While that presumption is rebuttable, a petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* Petitioner has not adduced any evidence to rebut this presumption—not even his own affidavit or that of his former attorney.

36

***The Fourth Ground***

In his fourth ground for relief, petitioner argues that his convictions for murder in the second degree and attempted murder in the second degree were "against the weight of the evidence." It is well-established that weight of the evidence claims are not cognizable on federal habeas review because they do not present a federal constitutional issue. *See, e.g., Holder v. Perlman*, No. 06 CV 5590, 2009 WL 1491160, at *5 (E.D.N.Y. May 27, 2009); *Taylor v. Poole*, 538 F. Supp. 2d 612, 618 (S.D.N.Y. 2008). "Weight of the evidence" claims stem from CPL 470.15(5), which allows an intermediate appellate court to reverse or modify a conviction where the court determines that the verdict was, in whole or in part, against the weight of the evidence, meaning that the "trier of fact has failed to give the evidence the weight it should be accorded." *See People v. Bleakley*, 69 N.Y.2d 490, 495, 515 N.Y.S.2d 761, 763 (N.Y.1987) (distinguishing weight of the evidence claims from claims based on the legal sufficiency of the evidence). As noted at p. 26, *ante*, federal habeas review is not available to address errors involving state law. *See Ponnapula*, 297 F.3d at 182, *see also* 28 U.S.C. 2254(a) ("a district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."). Furthermore, even if the Court could review petitioner's weight of the evidence claim, it would reject that argument for the reasons set forth on page 39, *post*.

***The Fifth Ground***

Petitioner's fifth ground for habeas corpus relief consists of a single sentence, alleging that he "was denied the effective assistance of counsel at trial and on direct appeal of his conviction for all of the grounds enumerated herein." In light of petitioner's *pro se* status, the

Court assumes that petitioner intends to raise the grounds which he exhausted in his writ of error coram nobis, as well as any grounds which were exhausted in the course of his direct appeal.

### A. Ineffective Assistance of Trial Counsel

While petitioner's Appellate Division Brief did not contain a separate point alleging ineffective assistance of counsel, it incorporated ineffective assistance claims into both Points II and III. Point II was abandoned in the New York Court of Appeals and was not exhausted, and Point III alleged only that trial counsel was ineffective in failing to object to the allegedly defective *Allen* charge. However, as noted at pp. 31-33, *ante*, that ineffective assistance claim is without merit.

### B. Ineffective Assistance of Appellate Counsel

The petition for a writ of error coram nobis faulted petitioner's appellate counsel for failing to raise two arguments: 1) that "the weight and sufficiency of the evidence ... were insufficient to sustain appellant's conviction" and 2) that trial counsel was ineffective because he "failed to litigate a number of issues to include prosecutorial misconduct in his opening and summation." Memorandum of Law in Support of Petition for Writ of Error Coram Nobis, p. 1. However, neither of those two arguments had any merit. First, the evidence was more than sufficient to prove beyond a reasonable doubt that petitioner was guilty of murder and attempted murder. While no one actually saw petitioner fire the shot which killed Beyra Henriquez and wounded Jaen, three eyewitness testified that they observed petitioner with a gun either shortly before or shortly after the shooting. In addition, there was evidence of a motive— that Jaen had beaten petitioner in a fistfight a few months before the incident—and evidence of consciousness of guilt: namely, that petitioner left New York shortly after the incident and began living in

Virginia under assumed names. Finally, there was evidence from petitioner's own uncle that petitioner had confessed his responsibility for the shooting.

This evidence, along with petitioner's admission to Detective Vergara that he was at the club the night of the shooting, was sufficient to establish that petitioner, intending to cause the death of Jaen, fired the shot that not only caused serious physical injury to Jaen, but also caused the death of Beyra Henriquez. Moreover, although defense counsel presented reasons to question the veracity and accuracy of the eyewitness and Lashley, the jury's verdict was not against the weight of the evidence. The testimony of these witnesses, which was apparently credited by the jury, provided an ample basis for the jury's finding that petitioner was guilty of intentional murder and attempted murder.

Second, the petition for a writ of error coram nobis did not identify any instances in which trial counsel's performance was substandard. While petitioner asserted that the prosecution's opening statement "misinformed the jury as to the substance of the witnesses['] testimony" and prejudiced the defense, *id.*, p. 4, petitioner did not suggest that defense counsel, who had not yet heard the testimony, was aware of the misrepresentations. Petitioner also asserted that trial counsel would have committed "malfeasance" if he failed to preserve the legal sufficiency argument, *id.*, p. 6, but claimed that his attorney moved to dismiss the indictment at the close of the People's case on the ground that the People had not adduced sufficient proof of the charged crimes. *Id.*, p. 5. Accordingly, petitioner has not established any basis upon which appellate counsel could have argued that his trial attorney provided ineffective assistance.

## CONCLUSION

For the reasons set forth above, the instant petition for a writ of habeas corpus pursuant to

28 U.S.C. § 2254 is denied and the case is dismissed. A certificate of appealability shall not

issue because petitioner has not made a substantial showing of the denial of a constitutional right.

*See* 28 U.S.C. § 2253(c)(2); *Lucidore*, 209 F.3d at 112-13. The Clerk of Court is directed to

enter judgment denying the petition and to close this case.

**SO ORDERED.**

/s/ *Sandra L. Townes*
SANDRA L. TOWNES
United States District Judge

Dated: June 9 , 2016
Brooklyn, New York